IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JANET KINGSTON STILL, substitute,   §
party for RONALD BRIAN STILL     §
(DECEASED)                           §
     Plaintiff,               §
                               §
V.                             §       CIVIL ACTION NO. H-06-2977
                               §
MICHAEL J. ASTRUE,        §
COMMISSIONER OF THE       §
SOCIAL SECURITY ADMINISTRATION, §
                               §
                               §
     Defendant.            §

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 14), and Memorandum in Support (Document No. 15), and Plaintiff's Reply thereto and Exhibits (Document Nos. 18 & 19), and Plaintiff's Motion for Summary Judgment (Document No. 16-1), and Memorandum of Law in Support (Document No. 16-2). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 14) is DENIED, Plaintiff's Motion for Summary Judgment

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on March 21, 2007. (Document No. 13).

(Document No. 16) is GRANTED, and that the decision of the Commissioner is REMANDED for further proceedings.

## I. Introduction

Plaintiff, Janet Kingston Still, brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her late husband, Ronald B. Still's ("Still") applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). According to Plaintiff, substantial evidence does not support the ALJ's decision, and the ALJ, William B. Howard, committed errors of law when he found that Still retained the residual functional capacity ("RFC") for a range of light work, and that while he could not perform his past work, he could, nonetheless, perform work as a telephone clerk, office helper, and information clerk. Plaintiff seeks an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding this matter for further proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Still was not disabled as a result of his impairments, that the decision comports with applicable law, and that it should, therefore, be affirmed.

## II. Administrative Proceedings

On October 6, 2003, Still applied for supplemental security income benefits and disability insurance benefits claiming that he has been unable to work since January 31, 2003, as a result of back pain, high blood pressure, heart disease, joint pain from undifferentiated connective tissue disease, and depression. (Tr. 74-76, 329-331). The Social Security Administration denied his

applications at the initial and reconsideration stages.  (Tr.34-47, 333-345).  After that, Still requested

a hearing before an ALJ.  (Tr.48).  The Social Security Administration granted his request and the

ALJ held a hearing on June 22, 2005, at which Still's claims were considered *de novo*.  (Tr. 346-388).

On November 23, 2005, the ALJ issued his decision finding Still not disabled.  (Tr. 14-25).  The ALJ

found at step one that Still had not engaged in significant gainful activity since his alleged disability

onset date.  At step two, he  found that Still had hypertension, undifferentiated connective tissue

disorder, coronary artery disease, major depression, pain disorder, and degenerative joint disease of

the lumbar spine, which are severe impairments.  Next, at step three, the ALJ found that Still's

impairments were not severe enough to meet or equal any of the listed impairments in the Social

Security Regulations, which would require a finding that he was disabled.  At step four, the ALJ

concluded that Still retained the residual functional capacity ("RFC") to perform a range of work at

the light level. Specifically, the ALJ found:

> Claimant has the residual functional capacity to perform a range of light work.  Light
> work involves lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be
> very little, a job is in this category when it requires a good deal of walking or
> standing, or when it involves sitting most of the time with some pushing and pulling
> of arm or leg controls.  To be considered capable of performing a full or wide range
> of light work, an individual must have the ability to do substantially all of these
> activities.  If someone can do light work, we determine that he can also do sedentary
> work, unless there are additional limiting factors such as the loss of fine dexterity or
> inability to sit for long periods.  The undersigned finds that the claimant is able to sit
> for a total of 6 hours in an 8-hour day.  He can stand/walk for a total of 2-3 hours in
> an 8-hour day.  He can lift and carry 20 pounds occasionally and 10 pounds
> frequently.  He will need the option to use a cane.  He is restricted from climbing
> ropes, ladders or scaffolds.  He is also restricted from crawling.  He has the ability to
> frequently but not constantly use fine finger and gross manipulation for objects.  He
> is restricted from working in an environment where there are excessive fumes, dust,
> odors, gases or chemicals.  The work should involve work at a non-assembly line
> pace.  (Tr. 22, 24).

The ALJ further concluded that Still could not return to his past relevant work as a construction equipment mechanic. (Tr. 22, 24). At step five, based on Still's RFC, and the testimony of Byron Pettingill, a vocational expert ("VE"), the ALJ concluded Still was not disabled because he could perform a range of light work and could perform jobs such as a telephone order clerk, an officer helper, and an information clerk, all of which are jobs that exist in significant numbers in the regional and national economy, and that he was, therefore, not disabled within the meaning of the Act.

Still sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 13). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 404.970, 416.1470. After considering Still's contentions, including correspondence dated December 12, 2005 (Tr. 9-12), in light of the applicable regulations and evidence, the Appeals Council concluded, on February 24, 2006, that there was no basis upon which to grant Still's request for review. (Tr. 5-8). The ALJ's findings and decision thus became final.

Still died of a myocardial infarction on February 25, 2006. (Tr. 27, Document No. 17). Still's wife, Janet Kingston Still, has substituted in as a party. She has timely filed an appeal of the ALJ's decision denying her husband's applications for DIB and SSI. 42 U.S.C. § 405(g). The Commissioner has filed a Motion for Summary Judgment (Document No. 14), and a Memorandum in Support thereof (Document No. 15), to which Plaintiff has filed a Response and Exhibits. (Document Nos. 18 & 19). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 16). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 388 (Document No. 10), and in the supplemental transcript, page 389.  (Document No. 9).  There is no dispute as to the facts contained therein.

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is, only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  *Id.*  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any

substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan*

*v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of

proof on the first four steps of the analysis to establish that a disability exists.  If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.

*McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that

other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v.*

*Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner

determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step five that Still, despite his impairments and limitations, could

perform a range of light work.  Then, based on Still's age (49), education (completion of the eleventh

grade), work experience (construction equipment mechanic), and relying on the testimony of a

vocational expert and the Medical-Vocational Guidelines as a framework, the ALJ concluded that

Still was not disabled because he could perform a range of light work, and could perform jobs such as a telephone clerk, an officer helper, and an information clerk, all of which are jobs existing in significant numbers at the regional and national levels.  In this appeal, the Court must determine whether substantial evidence supports the ALJ's step five finding.

According to Plaintiff, substantial evidence does not support the ALJ's step five finding because the ALJ failed to comply with SSR 96-7p.  According to Plaintiff, the ALJ failed to discuss, much less consider, the side effects of his medication such as Zoloft, which he testified made him drowsy.  Similarly, Plaintiff contends the ALJ further erred by dismissing Still's testimony with conclusory generalizations and boiler plate language.  With respect to the ALJ's finding that Still had not been compliant in following the treatment advice of Dr. Rick Boyles,  Plaintiff argues that the ALJ failed to specifically identify the treatment(s) he missed or how the lack of treatment(s) impacted him.  Plaintiff further argues that Still was without financial resources to afford office visits with Dr. Boyles, that he owed Dr. Boyles money as he had fallen behind in his bill, and because he could not afford an office visit he had been calling for refills, which were free.  According to Plaintiff, the ALJ's reliance on Dr. Boyles' letter suggesting Still had not been compliant and was seeking pain medication was misplaced in light of Dr. Boyles' own drug seeking behavior that was investigated by the Texas Medical Board.  Plaintiff asserts this calls into question Dr. Boyles' credibility as it relates to his treatment relationship with Still.  Also, Plaintiff contends the ALJ erred in evaluating Still's allegation that he was disabled due to depression.  According to Plaintiff, the ALJ erred in finding there was no evidence of decompensation given Still's suicide attempt in August 2004, and his involuntary commitment from August 9, 2004 to August 14, 2004.  Finally, Plaintiff contends that Still's death on February 25, 2006, from a massive heart attack, is relevant to the instant appeal as it constitutes new evidence to show that Still suffered from an ongoing serious heart problem as

evidenced by a strong family history of heart disease, obesity, high cholesterol, high triglycerides, diabetes, and hypertension, all of which contributed to his death, and is therefore relevant to his allegation that he was disabled due to heart problems.  Plaintiff argues that the instant action should be remanded in order for a physician to evaluate the records and opine whether Still's fatal heart attack constitutes evidence that Still's heart conditions were more limiting than the Medical Expert opined.  In addition, Still argues that the ALJ erred by relying on the testimony of the vocational expert because Still had not yet undergone a psychological evaluation, and any psychological limitations therefore were not included in the hypothetical questions posed to the VE.   According to Still, the jobs identified by the VE require a higher level of functioning  and are inconsistent with the mental RFC findings by the ALJ.

In response to Plaintiff's arguments, the Commissioner contends that evidence relating to the time after the ALJ's decision and denial of review by the Appeals Council is not binding, and in any event, does not support the inference that Still's fatal heart attack five years after an angioplasty procedure constitutes evidence that Still's heart condition was more severe than the records suggest. The Commissioner maintains the new evidence suggests that Still's condition may have worsened. According to the Commissioner, the ALJ, relying on the testimony of a medical expert, Dr. Jou Hoang, found that Still did not meet or equal Listing 4.03 because there was no evidence of a myocardial infarction, and as a  result, substantial evidence supports the ALJ's finding that Still did not have disabling heart disease prior to the date of decision by the ALJ.  As to Plaintiff's other arguments, the Commissioner contends that substantial evidence supports the ALJ's RFC determination, that the ALJ properly considered credibility and pain, and that with respect to Still's alleged psychiatric impairment, that the ALJ carefully considered Still's psychiatric impairments and indeed included this in the hypothetical question, wherein, Still was limited to jobs with a non-

assembly line pace, which the Commissioner suggests is consistent with an individual such as Still with moderate impairments in concentration and social functioning and the need for a low stress work environment.    In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren,* 925 F.2d at 126.  Any conflicts in the evidence are to be resolved by the ALJ, and not the Court. *see Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000)(citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

## V.  Discussion

The medical records in the instant action reveal that Still had complained of and been treated for a variety of health problems dating back to 1995, with the majority of his records relating to joint/back pain, hypertension that was treated by medication, and heart disease.

In a letter dated October 23, 1995, Dr. Philip Waller wrote to Still's then treating doctor, Dr. Bevan, concerning Still's complaints of joint pain, specifically, pain in the left first MTP joint and discomfort in the knees and right elbow.  (Tr. 169-170).  Dr. Waller opined that Still appeared to have "possible gout of the first right metatarsal joint, right lateral epicondylitis and a left third trigger finger."  (Tr. 169).  Still had a follow up appointment with Dr. Waller on November 10, 1995. According to the treatment note, Still's symptoms were puzzling.  He wrote:  "[h]is physical exam has not been consistent with overt rheumatic disease, but I am concerned by the ANA."  (Tr. 168). At Still's December 21, 1995, appointment, Dr. Waller noted that Still had an enlarged right first metatarsal joint with tenderness but otherwise had a full range of motion and no synovitis.  Dr. Waller

diagnosed Still with "undifferentiated connective tissue disease including a positive ANA and polyarthralgias." (Tr. 167).

Still had an appointment on February 1, 1996, with Dr. Waller. Still complained of increased pain in his feet and hands, which had limited his daily activities. According to the treatment note, Still's left second and third MCP joints were puffy, and there was diffuse joint tenderness with the MTP joint. Based on these findings, Dr. Waller wrote that Still appeared to be developing a rheumatoid arthritis pattern, and in response to this emerging pattern, prescribed Plaquenil. (Tr. 165). At Still's next visit, on March 7, 1996, Still was "doing better." (Tr. 164). Similarly, at Still's May 8, 1996, appointment with Dr. Waller, Dr. Waller noted that Still was "still stable" with respect to his connective tissue disease but because of increased arthralgias increased the dosage of Plaquenil. Still had some "puffiness" of the right second PIP joint, stiffness in the shoulders, and was neurologically intact. (Tr. 163). Still had an x-ray taken of his pelvis on June 17, 1996. It showed no abnormality. (Tr. 251). Still returned for a follow up appointment with Dr. Waller on July 11, 1996. (Tr. 162). Still had lost six pounds and stated that he "feels good." Still reported no increase in pain without steroids and was doing well with fatigue. He had no active synovitis. (Tr. 162). A liver and spleen scan that was taken on August 30, 1996, was normal. (Tr. 250). In August, Still stopped taking Plaquenil. Dr. Waller noted at Still's September 11, 1996, office visit that he had no active synovitis but tenderness was noted when testing the range of motion in Still's knees and shoulders. (Tr. 160). Dr. Waller restarted Still on a low dose steroid and Plaquenil on October 14, 1996. (Tr. 161). The treatment note shows that Still had no active synovitis, a full range of motion in his joints, and his heart exam was normal. (Tr. 161). An abdominal CT scan that was taken on October 9, 1996, revealed fatty changes in the liver but otherwise, "the aorta appears unremarkable. No other significant intra-abdominal or retroperitoneal findings are noted." (Tr. 248-249).

Still was not seen again by Dr. Waller until January 15, 1997. (Tr. 159). According to the treatment note, Still was "doing well", he was "tolerating his medicines", and he had no active synovitis. (Tr. 159). Dr. Waller wrote that Still was "doing well" at his April 16, 1997, appointment. (Tr. 158). The treatment note revealed that Still "now has some lower back pain and may have some involvement of a nerve root." (Tr. 158). Neurologically, Still was intact. Lumbar spine x-rays taken on April 14, 1997, showed "degenerative changes in the lumbar spine" and "spondylosis most marked anteriorly at L3/L4." (Tr. 247). In particular,

> There is moderate spondylosis at L3/4 anteriorly. There is mild spondylosis elsewhere in the mid and lower lumbar spine including small posterior bony spurs. There is moderate disc height narrowing at L5/S1 and mild disc height narrowing at L4/5. No subluxation is identified. The facets show minimal degenerative changes at L4/L5. (Tr. 247).

Clinically, this was confirmed by Dr. Waller who noted that Still had a positive straight leg raise on the left at 70 degrees and had tenderness with flexion and extension of the back that radiated down into the anterior portion of the left leg. (Tr. 158). Also, at this visit, Still reported drowsiness caused by his prescribed medications of Daypro, Soma and Vicodin. (Tr. 158).

Still was not seen again by Dr. Waller until August 15, 1997. (Tr. 157). Again, Still reported that he was "doing well." His general medical examination was unremarkable, and as to his extremities, Still had no synovitis and had a good range of motion of his joints. (Tr. 157). Still returned for his follow up office visit on December 18, 1997. (Tr. 156). Still had lost 35 pounds since his last appointment. Dr. Waller noted that while Still had five active rheumatic lesions, he had no synovitis in his joints or nodules. (Tr. 156).

At Still's March 13, 1998, office visit with Dr. Waller, Still reported increased pain in his left foot and right knee. (Tr. 155). Still's examination showed tenderness in the left first MTP. The examination further revealed no peripheral synovitis. (Tr. 155). Still was not seen again by Dr.

Waller until August 25, 1998, at which time, Dr. Waller told Still to limit his Vicodin usage. Dr. Waller also noted that Still had "good weight loss." (Tr. 154).  At Still's November 19, 1998, office visit, Dr. Waller noted that Still continued "to do fairly well but on certain days he does have increased polyarthalgias which require some pain medication use." (Tr. 153).  Still reported no new chest pain.  With respect to Still's medication regime, Dr. Waller noted that Still was taking Indocin, Plaquenil, and hydrocodone.  Dr. Waller described Still's rheumatic disease as "stable" and urged Still to cut back on hydrocodone.  (Tr. 153).

The medical records further reflect that Still had a follow up appointment with Dr. Waller on March 12, 1999.  (Tr. 152).  Dr. Waller noted that Still had lost over 110 pounds.  Still reported that his knees continued to bother him but he denied having any other rheumatic complaints such as chest pain.  (Tr. 152).  The results of Still's physical examination showed that Still had no new synovitis of the joints.  He did, however, have some tenderness with the range of motion of the shoulders and hips.  Based on these clinical findings, Dr. Waller increased the dosage of Indocin he has previously prescribed and gave Still a dose of methylprednisoline, 100 mg.  (Tr. 152).  Still was next seen by Dr. Waller on August 3, 1999, at which time he had a total weight loss of 121 pounds.  Still complained of some right knee pain but otherwise was stable.  Still was continued on Indocin, Plaquenil, and Vicodin.  (Tr. 151).  At Still's December 28, 1999, appointment, he complained of pain in his feet, knees, and hip.  (Tr. 246).

Because of pain in his left big toe, Still returned to Dr. Waller on January 4, 2000.  (Tr. 147).  Still reported that he had no chest pain or shortness of breath**,** that his right knee was stable and he was not bothered by fatigue.  The examination of his joints revealed no "typical synovitis of either an inflammatory nature or appearance of gout."  Dr. Waller opined that Still "at last appears to be holding his own but the right foot still bothers him.  Because of that, try Celebrex." (Tr. 147).  Blood

work showed that Still was slightly anemic.  (Tr. 148).  Still returned for a follow up visit on January

15, 2000.  (Tr. 246).  The treatment note indicates that Still weighed 287 pounds.  (Tr. 246).

In February 2000, Still started seeing a new treating physician Dr. Rick A. Boyles.  (Tr. 221,

222).[2]  At his initial office visit on February 16, 2000, Still described his chief complaint as "arthritis."

Still stated that he had a family history of heart disease.  (Tr. 221, 222).  The nurse noted that the last

toe of Still's right foot was swollen, his knees were swollen as where his hips and joints in his finger.

Dr. Boyles opined that Still had rheumatoid arthritis and gout.  He wrote prescriptions for Soma,

Lortab, and Prednisome.  (Tr. 221, 222).  Still called for a refill of his prescriptions on February 5,

2000.  (Tr. 246).  Still was seen by Dr. Boyles on March 18, 2000.  (Tr. 245-246).  According to the

treatment note, Still needed refills.  (Tr. 245-246).

In the spring of 2000, Still was in a car accident. He was referred by Dr. Boyles to the

Fondren Orthopedic Group, where he was evaluated by Dr. J. Kevin Horn on April 6, 2000.  (Tr.

173).  Still denied heart problems.  Still's symptoms included pain in the left hip, right leg, right knee,

left ankle and left foot.  Dr. Horn indicated that Still was taking Prednisone and Soma.  (Tr. 171).

Dr. Horn, in a letter to Dr. Boyles, opined: "clinically, I suspect a mild cervical strain which is

improving.  In addition, he has a mild lumbar strain which also is improving."  (Tr. 172).  Still's

treatment note from May 27, 2000, revealed that he had "good symptomatic relief from medication

and doing well."  (Tr. 245).  Dr. Boyles records indicated that Still weighed 264 pounds at his July

15, 2000, appointment.  Dr. Boyles wrote  Still had "good symptomatic relief." (Tr. 244).  Similarly,

at Still's August 18, 2000, office visit, Dr. Boyles wrote:  "good pain relief from medication.  Able

to drive and work."  (Tr. 244).  On September 5, 2000, Still stated he was having problems at work

---

[2] The majority of the treatment notes from Dr. Boyles are cursory and reveal little about Still's
physical condition.  Most show prescription refills.

due to pain.  (Tr. 244).  Still again complained of increased pain at his September 18, 2000, appointment.  (Tr. 220).  In addition, Still reported chest pain radiating down his arm and weakness. He denied being dizzy or short of breath.  (Tr. 220).  His examination revealed that he had trigger point pain over the left anterior chest and shoulder.  Dr. Boyles diagnosed shoulder strain.  Dr. Boyles continued Still on Prednisone, Soma and Lortab.  (Tr. 220).  At his September 23, 2000, appointment, Still reported "good pain control."  (Tr. 244).  Still was treated for a cough/cold by Dr. Boyles on October 13, 2000.  (Tr. 219).  At Still's two appointments on November 2 and 17, he reported that he was doing well and able to work.  (Tr. 243).  The treatment note from Still's December 11, 2000, appointment with Dr. Boyles revealed that Still told the nurse he had been taken by ambulance to Hermann Hospital because he had blacked out.[3]  The results of Still's physical examination are unknown as only checks were marked.  Blood work revealed that Still had high triglycerides and high cholesterol.  (Tr. 214-217).  Dr. Boyles discussed the results of Still's blood work at his December 19, 2000, office visit.  (Tr. 213).  Still had paraspinal tenderness.  Dr. Boyles diagnosed Still as having sleep apnea, chronic fatigue, and chronic high blood pressure.  (Tr. 213).

The medical records show that Still reported doing well on his medications on January 13, 2001.  He contacted Dr. Boyles for a prescription refills for Soma and Lortab on January 23, 2001. (Tr. 212, 243).   Notes from the pain management clinic reveal that Still reported doing well on February 3, 2001.  (Tr. 242).  Still requested another refill on February 7, 2001, which Dr. Boyles refused.  (Tr. 212).  At Still's February 8, 2001, appointment, with Dr. Boyles, he reported that his daughter may have been taking his prescribed medication.  Dr. Boyles treated Still for a cough/cold/influenza.  (Tr. 211).  Still throughout March and April 2001 reported that he was doing

---

[3] There are no records of a visit by Still to Herman Hospital.

well and able to work. (Tr. 241, 242). In April, Still contacted Dr. Boyles' office for refills, including hydrocodone. Dr. Boyles approved his request. (Tr. 208, 209, 210). In May, Still reported doing well. (Tr. 241).

At Still's June 19, 2001, office visit with Dr. Boyles, Still complained of chest pain, nausea, tingling in his hands and feet, and stated that he had "passed out." Based on these complaints, Dr. Boyles ordered a holter monitor and referred Still to Dr. Sarma Challa, a cardiologist. (Tr. 205).

Still was seen by Dr. Challa on June 28, 2001. Still reported recurrent chest pain, two episodes of syncope and a strong family history of early coronary artery disease. (Tr. 194-195). On July 5, 2001, Still successfully underwent angioplasty. (Tr. 174-190). Still returned to Dr. Boyles on July 14, 2001, with a recurrence of low back pain with muscle spasm, hand pain, and knee pain. The treatment note shows that Still's small joints of his hands were enlarged, and with respect to his back, it was tender and he could flex to 60 degrees. (Tr. 240). Still had a follow up appointment with Dr. Challa on July 19, 2001. Dr. Challa wrote that Still was "doing well." (Tr. 174). Still had appointments with Dr. Boyles on August 7 and 24. According to the treatment notes, Still had "RA" and "chronic L5/S1." (Tr. 239). Still reported on September 14, 2001, that his recurrent low back pain was helped by medication but complained of intermittent joint swelling. (Tr. 238). Still had another follow up appointment with Dr. Challa on September 19, 2001. (Tr. 174-187). In connection with this appointment, Still had an EKG, which was within normal limits. (Tr. 176-187). Still reported that he was "doing well" but complained of pain in the "last mammary region, constant, lasting for several hours, usually worse at night, radiating all the way to the back on the left side only." (Tr. 174). The results of Still's physical examination showed that Still had "tenderness in the left intra-mammary region." (Tr. 174). Dr. Challa opined that Still had "left mammary pain, probably thoracic radiculopathy." Dr. Challa prescribed Motrin and Soma for pain relief. (Tr. 174).

The medical records further show that Still had appointments with Dr. Boyles on October 4, October 30, November 17, December 7, December 27, 2001, January 19, February 13, March 15, April 5, April 26, May 14, 2002, June 1, June 20, July 19, July 25, August 23, September 13, and October 23, 2002, January 2, January 25, February 13, March 15,  April 8, May 1, June 20 ("chronic L5/S5 with low back pain and lumbar muscle spasm"), August 8, September 10, October 10, October 31, 2003, and all of which show his condition was "unchanged" or "improved." (Tr. 201,  225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238).   Dr. Boyles sent  a "30 day letter" on November 21, 2002, seeking payment of Still's outstanding balance of $130. (Tr. 199-200).

On December 1, 2003, Still underwent a consultative examination by Dr. Donald Gibson.  (Tr. 252-256).   Prior to the examination, Still had an EKG (Tr. 255), and blood work to test for rheumatoid arthritis.  (Tr. 256).  The results of Still's physical exam revealed:

This is a pleasant male in no apparent distress.

HEENT:  Within normal limits

NECK:  Supple with no masses, adenopathy, or bruits.

LUNGS:  Clear, with no wheezing or rales.

HEART:  PMI is not displaced.  S1 and S2 are normal.  There are no thrills, murmurs, or gallops.

ABDOMEN:  Benign.

BACK:  Nontender with forward flexion of 60 degrees, extension of 20 degrees, and right and left opening 30 degrees.  Straight leg raise is negative.

NEUROLOGIC:  Nonfocal.  Motor and sensory are intact.  Gait and coordination are normal.  There is no localized sensory loss, muscle weakness, or atrophy.  Cranial nerves two through twelve are intact.  Gross mental status is clear.

EXTREMITIES:  No clubbing, cyanosis, or edema.  Peripheral pulses are intact. Peripheral joint exam is normal with full range of motion.  There is no warmth,

effusion, or deformity.  Grip strength using a dynamometer is 25kg in both hands.(Tr. 254).

Dr. Gibson, based on his own exam results along with laboratory and x-rays, opined:

1.  Heart Disease.  Stable. With no severe heart failure or evidence of angina.

2.  Hypertension.  Stable.  No renal or neurologic complications.

3.  History of Arthritis.  Mild.  No severe limitation of movement, evidence of radiculopathy, or severe joint deformities.  Patient's overall functional residual capacity is at the light level.

4.  Back Pain.  Mild.  No severe limitation of movement or evidence of radiculopathy. (Tr. 254).

A state agency medical consultant who reviewed Still's file but did not examine him, completed a form entitled "Physical Residual Functional Capacity" on December 4, 2003.  (Tr.264-271).  According to Dr. James A. Wright, Still could occasionally lift and/or carry fifty pounds; could frequently lift and/or carry twenty-five pounds; could stand and/or walk six hours in an eight hour workday; could sit about six hours; and had no problems pushing and/or pulling.  In addition, Still had no postural, manipulative, visual, communicative, or environmental limitations.  (*Id*.).

Still had an appointment with Dr. Manohar Alloju on March 5, 2004.  The treatment notes are illegible.  (Tr. 257-263).  Records from the Lava Rock Family Clinic dated March 30, 2004, reveal that Still sought treatment for left foot pain and pain in both hands.  (Tr. 280). Still was next seen at the clinic on April 26, 2004.  He requested a prescription for Celebrex.  (Tr. 279).  The records further show that on May 11, 2004, Still had an appointment with Dr. Giraldi.  Still complained of shortness of breath and he had a cough.  (Tr. 275).  Still returned to the Lava Rock Family Clinic on May 17, 2004.  He was treated for arthritis and body aches.  (Tr. 278).   At his appointment on June 10, 2004, Still complained of body aches.  (Tr. 278).  On July 2, 2004, Still had a follow up appointment with Dr. Giraldi.  Dr. Giraldi noted that Still was ambulating with a cane.

Still reported being "pretty good. same." (Tr. 273). Still contacted the Lava Rock Family Clinic on July 5, 2004, seeking medication for arthritis pain. (Tr. 277).

In early August 2004, Still was admitted to Ben Taub for a crisis evaluation. Still had been brought to the hospital by a Houston Police Department officer. Still threatened to kill himself, and had a loaded shot gun in his possession. He was diagnosed with major depressive disorder, recurrent and severe, and had a GAF of 25. Because Still's mental health evaluator found that Still was a danger to his person, he was involuntarily admitted and ultimately referred to the Intracare North Hospital on August 10, 2004. (Tr. 283, 286, 287, 289-315). Still's intake records show that his cardiac and musculoskeletal systems were normal. During his hospitalization, Still was prescribed Lexapro and Topamax. He was discharged on August 14, 2004.

The ALJ, following the June 20, 2005, hearing, referred Still for a psychological evaluation. That evaluation was performed by Cecilia P. Lonnecker, Ph.D. on August 15, 2005. (Tr. 316-328). Dr. Lonnecker interviewed Still and administered IQ, achievement, neuropsychological and personality tests. Still ambulated with a cane and reported problems with depression and memory. Medications that Still was taking included Zoloft, Celebrex, Trazodone, Tylenol, and hypertension medication. Still had a GAF of 55. She opined that he had a "major depressive disorder, recurrent without psychotic symptoms. She wrote:

> Axis I:   (1) 296.33-Major Depressive Disorder, Recurrent, without psychotic symptoms. The claimant has a  history of suicidal gesturing. He reports depressed mood, tearfulness, anhedonia, hopelessness, social withdrawal, and feelings of guilt.

> 2. 307.89-Pain disorder Associated with Both Psychological Factors and a General Medical Condition. The claimant reports diagnosis of rheumatoid arthritis. He reports a history of back pain. The claimant's emotional difficulties may exacerbate his pain and compromise his ability to cope.

*                         *                         *

> Prognosis:  Prognosis will depend on the claimant's compliance to treatment.  He will
> need to follow the directives of his medical team.  (Tr. 323).

(Tr. 323).  Dr. Lonnecker completed a Mental Residual Functional Capacity Assessment, in which she assessed whether Still had "no" limitations, "slight" limitations, "moderate" limitations, "marked" limitations, or "extreme" limitations in various areas.  Dr. Lonnecker opined that Still's depression had not affected his ability to understand, remember and carry out instructions.  Specifically, Still could understand and remember short, simple instructions; carry out short, simple instructions; understand and remember detailed instructions; carry out detailed instructions; and that he had the ability to make judgements on simple work related decisions.  (Tr. 326).  As to Still's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting, Dr. Lonnecker  opined that Still had "slight" limitations in his ability to interact appropriately with the public, interact appropriately with supervisor(s), interact appropriately with co-workers, and to respond appropriately to changes in a routine work setting.  In contrast, Dr. Lonnecker opined that Still had "moderate" limitations with his ability to respond appropriately to work pressures in a usual work setting.  (Tr. 327).

In this case, the ALJ sought the assistance of Jou Hoang, M.D., to evaluate the medical evidence available.  According to Dr. Hoang, an internist, Still had hypertension and cardiac disease, but his conditions did not meet the following listings: 1.04, 4.03, 4.04 or 14.06.  (Tr. 367-371).  Dr. Hoang testified:

> A.  The medical evidence of record revealed the claimant has hypertension.  Listing
> would be 4.03.  He does have some cardiac disease too.  Ischemic heart disease.  But
> there is no evidence of myocardial infarction.  There is no stroke and no kidney
> failure.  So he does not meet listing 4.03.  He had evidence of coronary artery disease,
> listing 4.04.  He was admitted for syncope in June 28, 2001, exhibit 3F, page 22.
> They did a cardiac catheterization on the same day, 6/28/01, exhibit 3F, page 18,
> showing that the x-ray showed 80 percent occlusion of the right coronary artery.  And
> a few days later, on July 5, 2002, exhibit 3F, page 17, he had a stent to correct that

occlusion of the right coronary artery.  So even though he met a listing on that day when they did the coronary catheterization because of one coronary artery that is blocked more than 70 percent, it was corrected right away, within a week, I think.

*                              *                              *

...Because there was occlusion on two sides.  That's why they put two stents on the same coronary artery.  But they did correct the occlusions of the coronary arteries and he was followed by different doctors.  The last one was from the Lava Rock Family Clinic.  The last entry was from July 5, 2004, and there was no complaint of any more chest pain related to his coronary artery disease.  So he does not meet the listing 4.04 for ischemic heart disease.  He also has arthritis that was diagnosed at (inaudible) when he was seen by a rheumatologist, Dr. Waller.  He made a diagnosis of differentiated connective tissue disease because he has (inaudible) NA.  But the rheumatoid factor was negative.  So he was treated with (inaudible) until January 4, 2000, and then he did not followup with the rheumatologist.  He had followup with the (inaudible) people, and then he had the – the latest one would be the Lava Rock Family Clinic.  He has pain affecting his back, his knee, his hands.  He was (inaudible) Gibson in December 1, 2003 (inaudible).  The reason I'm referring to that is because it gives us a more factual description of what his physical findings would be.  (inaudible).  The fact that he has pain, but they did not describe what the physical findings are, and what he could do in terms of walking or performing fine manipulation.  Dr. Gibson saw him, and on that day stated that he has arthritis with pain in his left hip, knees, and hands, but is able to walk without an assistive device, even though he has difficulty squatting.  And he is able to perform light work activities, and does not have any difficulty performing coarse motor manipulation.  They did test his grip strength, 7F, page 3.  It said the grip strength, using a dynamometer of (inaudible), 85kg of both hands.  So in this assessment, his arthritis (inaudible), no severe limitations of movement, no evidence of radiculopathy, no severe limitations of movement, no evidence of radiculopathy, no severe deformities.  Patient's (inaudible) is at the light level.

*                              *                              *

A.  As I say, he was able to ambulate without an assistive device.  And as far as his back is concerned, there was some decreased range of motion of the lumbar spine, but the straight leg raise was negative.  I was looking at x-rays of the back, and the only one you can see from x-rays of the lumbar spine in 97A, dated April 16, 1997, page 1F–page 12– showing he had some arthritis with facet changes of levels L3-4, L4-5, and L5-S1.  And at 6F, page 24, he also has another x-ray on April 14, 1997.  I don't understand, but they say that he has degenerative disease at levels L4-5, L5-S1.  He also has spondylosis at level L3-4.  If there is some other x-ray showing some fusion of the spine, I would like to know so I can look at it.  X-ray report that was mentioned by the representative.

      \*       \*       \*

 A.  So I consider him, on the degenerative connective tissue disorder 14.06.  And 14.06, degenerative connective tissue disorder, you have to consider him under listing 14.02 and 14.04.  14.02 is for (inaudible) he has severe involvement of any other system, except for his joints.  So he does not meet listing 14.02, either A or B.  Under listing 14.04, which is systemic (inaudible).  You know.  Usually, when (inaudible) of your body.  But (inaudible) seems to have problems with his joints.  And he does have (inaudible) record, evidence of severe systemic symptoms like fever, fatigue, malaise, and weight loss.  So he does not meet the listing 14.06.  Undifferentiated connective tissue disorder.  He also has a (inaudible) disorder of the spine because he has complained of back pain.  But x-rays seem to be very benign, as well as physical findings when he was looked at by Dr. Gibson in December 1, 2003.  So he does not meet the listing 1.04 either.  And then he has a mental impairment that was documented in August 2004 when he was admitted for major depression.

      \*       \*       \*

 A.  No, your Honor.  He does not meet or equal the listings that I have enumerated. (Tr. 367-370).

In addition, Dr. Hoang testified that Still could do light work restricted to the extent that Still could stand/walk for no more than 2 to 3 hours out of an 8 hour work day, and was not required to climb ropes, scaffolds, or ladders.  Dr. Hoang further testified that Still had partial postural limitations, should avoid environmental fumes, heights and dangerous equipment.  (Tr. 371-373).

 Still had a massive heart attack and died on February 25, 2006.  (Document No. 17).

 Here, upon the totality of the record, the objective medical evidence factor weighs in favor of the ALJ's conclusion that Still's impairments of hypertension[4], undifferentiated connective tissue

---

 [4] Still's medical records are replete with over seventy-five blood pressure readings, commencing October 23, 1995, through July 5, 2004.  (Tr. 151, 152, 156, 157, 158, 159, 160, 161, 163, 164, 165, 167, 168, 169, 170, 174, 211, 221, 222, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 238, 239, 240, 241, 242, 243, 244, 245, 246, 253, 257-263, 273, 274, 275, 277, 278 279, 280).  Overall, Still's hypertension was controlled through medication, and there is no suggestion of end organ damage caused by hypertension.  There is only one reference to Still's hypertension being "not controlled" on April 8, 2003, with a reading of 155/100.  That said, diastolic reading of 100 or higher were not uncommon.  For example, 140/100 on September 11, 1996 (Tr. 160), 170/110 on December 28, 1999 (Tr. 246), 161/102 on September 23, 2000 (Tr. 244), 149/102 on October 10, 2000 (Tr. 243), 147/104 on December 16, 2000 (Tr. 243), 165/100 on January 13, 2001 (Tr. 211),

disorder, coronary artery disease,[5] major depression,[6] pain disorder and degenerative joint disease of the lumbar spine were severe impairments but that the impairments, individually or in combination did not meet or equal a relevant listing.

The ALJ found that Still retained the RFC for a range of light work, restricted to the extent:

---

152/102 on May 26, 2001 (Tr. 241), 157/108 on March 15, 2003 (Tr. 229), 155/100 on April 8, 2003 (Tr. 228), 140/100 on December 1, 2003 (Tr. 253), 140/100 on March 30, 2004 (Tr. 280), 140/100 on May 25, 2004 (Tr. 274). The four final readings for 2004, are all within the therapeutic guidelines: May 17, 2004, 106/80 (Tr. 278), June 20, 2004, 120/80 (Tr. 278), July 2, 2004, 130/90 (Tr. 277), and July 5, 2004, 110/70 (Tr. 277).

[5] Plaintiff argues that Still's fatal heart attack suggests that Still's heart condition was more severe and limiting than the records and testimony by Dr. Hoang suggested. Plaintiff contends the matter should be remanded for consideration of Still's death certificate and final medical records of his fatal heart attack. Plaintiff contends that the death certificate and medical records are new and material evidence of his underlying heart condition, and that in light of the new evidence there is a reasonable probability that the ALJ's decision would have been different. In response, the Commissioner contends that evidence relating to the time after the ALJ's decision and the Appeals Council decision are not binding and, to the extent that it might be considered, shows a worsening or deterioration of Still's condition, and as such is not new or material evidence warranting a remand. The Commissioner points to the lag in time between the angioplasty and the fatal heart attack, (five years), the absence of medical evidence showing underlying heart disease, and the testimony of Dr. Hoang on this point. In *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995), the Fifth Circuit wrote: "In order to justify a remand, the evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence into the record in a prior proceeding." In addition, the new evidence must also pertain to the contested time period and not merely concern a subsequently acquired disability or the deterioration of a condition that was not previously disabling. (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1058 (5th Cir. 1987)(per curiam). Here, upon this record, the fact that Still died of a heart attack does not demonstrate that the ALJ's decision was not supported by substantial evidence. It shows, at best, that Still's heart condition may have deteriorated or worsened, and under *Leggett* such a worsening or deterioration of a condition that was not previously disabling is neither new nor material.

[6] Plaintiff challenges the ALJ assertion, in evaluating Still's depression, that there were no examples of decompensation. According to Plaintiff, this statement ignores Still's suicide attempt in August 2004, and hospitalization. Here, the ALJ clearly misstated the record, as illustrated by Plaintiff. However, the record further reflects that the ALJ thoroughly evaluated Still's psychiatric complaints, including sending him for a consultative psychiatric evaluation. Any error, therefore, was harmless.

Claimant has the residual functional capacity to perform a range of light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. If someone can do light work, we determine that he can also do sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or inability to sit for long periods. The undersigned finds that the claimant is able to sit for a total of 6 hours in an 8-hour day. He can stand/walk for a total of 2-3 hours in an 8-hour day. He can lift and carry 20 pounds occasionally and 10 pounds frequently. He will need the option to use a cane. He is restricted from climbing ropes, ladders or scaffolds. He is also restricted from crawling. He has the ability to frequently but not constantly use fine finger and gross manipulation for objects. He is restricted from working in an environment where there are excessive fumes, dust, odors, gases or chemicals. The work should involve work at a non-assembly line pace. (Tr. 22, 24).

Plaintiff argues that the ALJ's RFC failed to incorporate, explicitly or impliedly, the mental RFC findings made by the ALJ wherein he wrote: "[i]t is found that the claimant's depression has a moderate impact upon his ability to perform daily activities" (Tr. 20), and that "claimant's ability to maintain social functioning is moderately affected" (Tr. 20), and "[t]he undersigned finds that due to depression and pain the claimant would have difficulty functioning in a stressful environment." (Tr. 20). According to Plaintiff, it is unclear from the RFC how the ALJ incorporated the mental RFC, other than Still was limited to work at a "non-assembly line pace." Here, upon this record, because the RFC is limited to work at a "non-assembly line pace" and given that the ALJ, either at the hearing or in his decision, did not elaborate upon, explicitly or implicitly, how "non-assembly line pace" is consistent with Still's mental RFC, this matter must be remanded for consideration of Still's RFC.

**B. Diagnosis and Expert Opinions**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir. 2000)(quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)). As such, if the treating physician's opinion is deficient in either respect, then it is not entitled to controlling weight.  The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id*.  "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176. (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez,* 64 F.3d at 176.

Even if an opinion of a treating physician is not entitled to controlling weight because it was not consistent with the other substantial evidence of the record and was not well supported by medically acceptable clinical and laboratory diagnostic techniques, the opinion nonetheless is still entitled to deference and must be weighed in light of the following factors:

(1)  the physician's length of treatment of the claimant,

(2)  the physician's frequency of examination,

(3)  the nature and extent of the treatment relationship,

(4)  the support of the physician's opinion afforded by the medical evidence of the record,

(5)  the consistency of the opinion with the record as a whole, and

(6)  the specialization of the treating physician.

*Newton*, 209 F.3d at 456.   "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required.  *see Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision concerning the medical records and weight accorded the opinions of examining and non-examining physicians, shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately.  The ALJ did not err in his assessment of the medical opinions.  In light of the medical records submitted, the diagnosis and expert opinion factor supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The third element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook v. Heckler,* 750 F.2d 391, 395 (5th Cir. 1985).  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides

that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 860 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

Still testified at the June 22, 2005, hearing.  According to Still, he was unable to work because of back pain.  (Tr. 353).  Still stated he found it difficult to get around.  Still testified he spends his day sitting in a straight back chair or lying in bed.  (Tr. 353).  In particular, Still stated that he was "most comfortable when I'm laying back in the bed with my hip propped up a little."  (Tr. 360).  Still further testified that he used to walk but he "always suffered for it later."  (Tr. 353).  Still testified that his wife assists him in dressing.  (Tr. 353-354).  In addition to his back, Still testified that he has problems with the first finger of his right hand and first finger of his left hand, worse in the right hand, and that this has resulted in a diminished grip strength.  (Tr. 354).  Still stated he is left handed and ambulates using a cane in his left hand.  (Tr. 355).  Still estimated that the heaviest item he could lift and carry was a plate of food.  (Tr. 356).

With respect to his medications, Still testified because of severe drowsiness he stopped taking Soma. He stated he had been taking Bextra and Vioxx but now was taking Celebrex. (Tr. 358). Also, Still testified that Zoloft makes his drowsy. (Tr. 360, 361). According to Still, because of his medication, he wakes up groggy and it takes approximately two to three hours to get over that feeling. (Tr. 358-359). In addition, Still testified about his depression. Still stated he attends weekly counseling sessions. Still further testified that with medication, his psychiatric problems are under control. (Tr. 361). Still stated he cries, but not as much as before. (Tr. 363).

With respect to his daily activities, Still has no hobbies. (Tr. 265, 366). Still testified he passes time watching television, playing cards or reading . (Tr. 359, 360). Still stated that his health problems have caused stress to his family. (Tr. 363, 364). In rejecting as not fully credible Still's complaints of pain and the alleged disabling side effects of Still's medications, the ALJ wrote:

> In making this assessment, the undersigned must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR §§ 404.1529 and 416.929, and Social Security Ruling 96-7p. The undersigned must also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations (20 CFR §§ 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-6p).
>
> The undersigned notes that the claimant testified as follows:
>
> His major problem is his back. He can sit a few hours then his legs go numb. He lies in bed with his head raised on pillows. He can walk 100-150 yards then he has to rest 10-15 minutes and start again. He lost the grip in his right hand. He can lift a plate of food and a book. A gallon of milk puts a strain on his back. He takes Celebrex for his back pain and it helps to relieve some of the pain. His doctor has suggested using a cane. He was hospitalized for mental problems. He sees a psychiatrist once every three months and a counselor once a week. He spends most of his day in bed. His sleeping medication makes him drowsy. He gets depressed and cries for no reason even on his medication.
>
> The Administrative Law Judge has taken into consideration the claimant's testimony and allegations of symptoms and limitations. The issue raised by the claimant's

allegation is not the existence of pain but rather the degree of pain and other subjective symptom's which the claimant experiences. The objective clinical findings (although not the only factor to be considered) do not support the degree of pain and functional limitations which the claimant alleges. Pain constitutes a disabling condition only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment. *Selders v. Sullivan*, 914 F.2d 614 (5th Cir. 1990). Careful consideration was given to the nature, location, onset, duration, frequency, radiation and intensity of any subjective symptoms or pain experienced by the claimant, as well as any precipitation and aggravating factors such as movement, activity and environmental conditions.

There is evidence that the claimant has not been entirely compliant in following prescribed treatment, which suggests that the symptoms may not have been as limiting as the claimant has alleged. (Exhibit 4F).

Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

The claimant's problems may be expected to produce mild chronic pain or discomfort, the medical records do not show repeated hospitalization or aggressive forms of therapy (such as surgery or treatment at a pain clinic) that would be expected if he experienced severe, persistent and unremitting pain.

There is no evidence to indicate serious muscle weakness, muscle spasm, atrophy, weight loss, or other signs of progressive deterioration which might be expected when an individual experiences intense and continuous pain. (Tr. 21-22)

Credibility determinations, such as that made by the ALJ in this case in connection with Still's subjective complaints, are generally within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert. denied*, 514 U.S. 1120 (1995). Because the record shows that the ALJ made and supported his credibility determination, and because the ALJ

did not rely on any inappropriate factors in making his credibility determination, this factor also weighs in favor of the ALJ's decision. There are inconsistencies between Still's subjective complaints and the objective medical evidence.   To the extent Plaintiff argues that the ALJ erred by not specifically mentioning the side effects of all of Still's prescribed medications, including Zoloft, when discussing that Still complained of drowsiness, any error was harmless given that the side effects of Zoloft was the same as that discussed by the ALJ, namely, drowsiness.   In addition, as to Plaintiff's argument that the ALJ's reliance on Dr. Rick Boyles' letter terminating their treatment relationship is misplaced given that Plaintiff has explained why Still missed appointments and called for refills, namely because Still could not afford to pay for his medical care, and given that Dr. Boyles' credibility is at issue based on Dr. Boyles being  disciplined by the Texas Medical Board for drug seeking behavior, Still has not shown, upon this record, that Dr. Boyles' own conduct is relevant to the instant action or that his disciplinary actions call into question the outcome of the ALJ's credibility assessment.

### D.  Education, Work History and Age

The fourth element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that Still was forty-nine years old at the time of the hearing, and had completed the eleventh grade of high school.  His past relevant work was as a construction equipment mechanic.  The ALJ questioned Ryan Pettingill, a vocational expert ("VE"), at the hearing about

Still's ability to do his past work and his ability to engage in other gainful work activities. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. `The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling v. Halala*, 36 F.3d 431, 436 (5th Cir. 1994).

Here, the ALJ posed the following hypothetical questions to the VE:

Q: Mr. Pettingill, assume a person the same age, education, and same vocational background as the claimant. Further assume the following limitations. Hypothetical one. The person could lift and/or carry 10 lbs. frequently and 20 lbs. occasionally. This person could stand and/or walk two to three hours of an eight-hour day. This person could sit six hours. This person requires the option to use a cane. Can only frequently fine finger and gross manipulate. Not constantly. Can only occasionally stoop, kneel, balance, crawl, and bend. Cannot climb ropes, ladders, or scaffolds. Cannot crawl. Can occasionally climb ramps and stairs. No working in an environment where there is excessive fumes, dust, gases, odors, or chemicals. Work should involve only simple, routine tasks, performed at a non-assembly line pace. Could this person do the claimant's past work?

A. Not in my opinion, your Honor.

Q. Would there be any jobs in the national economy this person could perform?

A.  Yes, sir.  I could give you some examples.  These are occupations that would allow someone a sit/stand option, your Honor.  A telephone order clerk.  There are about 600 in the region, and about 60,000 nationally.

Q.  Define region.

A.  The region I'm using today is the Gulf coast region.  It's Harris County and the eleven surrounding counties.

Q.  Okay. And how many nationally did you say?

A.  About 60,000.

Q.  All right.

A.   Information clerk.  There are about 500 in the region, and about 50,000 nationally.  And an officer helper. There are about 1,000 positions in the region, and about 100,000 nationally.

Q.  Hypothetical two.  Same as hypo one, but assume this person would need four to five unscheduled breaks a day for about 15 minutes each.  Any jobs?

A.  Over a period of time, no, your Honor.  That's more than the normal customary breaks and an employer is not going to tolerate that.  For a period of time, but if that's day in and day out---

*                              *                        *

Q.   This testimony provided today, Mr. Pettingill, does it conform to the U.S. Department's *Dictionary of Occupational Title*?

A.  Yes, sir, it does.  (Tr. 381-382).

In addition, Still's attorney also questioned the VE:

ALJ.  Mr. Pettingill, when you talked about the telephone order clerk and the information clerk, don't these require constant and repetitive input with their hands? Either on (inaudible) or a computer?

VE.  They can require frequent– up to two thirds of the day.  But constant is defined as more than two thirds of the day.  And according to the specific occupation selector, an information clerk only requires fine finger manipulation on an occasional basis. And a telephone order clerk on a frequent basis.  And my understanding of the hypothetical was no more than frequent fine finger manipulation.

ALJ..  Okay.  And don't all of these require stooping, bending, since they are generally sedentary and require gathering information from file cabinets and various and sundry places?

VE.  Again, stooping in these jobs is on an occasional basis.  And that was what the hypothetical stated.  Occasional stooping.

ALJ.  Are these jobs sedentary?  Or light?

VE  One of them is classified as a sedentary job.  The other two are classified as light jobs?

ALJ.  Which one is sedentary?

VE.  The order clerk.  The info and office helper are light jobs. Actually, I gave you telephone information clerk, and that's considered sedentary work as well.  But the office helpers are a light exertional job.

ALJ.  Did you take into consideration any of the claimant's testimony?

ALJ:  He was just responding to hypothetical.

Atty:  I understand that.

ALJ:  So, I mean, how could he have taken that into consideration?  I have him a hypothetical.  He answered my hypothetical.  I didn't ask him anything other than my hypothetical, after we cleared all the background information.  So obviously he would not have taken anything into account, other than what he was asked, which was my hypothetical.  At least in giving those jobs.  So if you have another hypothetical, please provide it.

Atty:  Okay.  Hypothetical one.  If a person were to have the limitations as testified by the claimant, would he be able to do, in your opinion, any or all of these jobs?

ALJ:  No.  It's too global.  Too global.   Provide a specific limitation.  One of more specific limitations.

Atty:  If a person were to be able to sit for no more than an hour, and then have difficulty rising independently, moving off and ambulating without assistance, and without having to stop and wait, would that impact their ability to do these jobs?

VE:  It would– in my opinion, it would impact the ability to work as an office helper. Because there is a requirement to sit, stand, walk about in that occupation.  But the other two occupations are sedentary position.  If would impact.  Certainly would impact their ability to do that work, but I don't think it would preclude it.

Atty:  Would it erode the occupational base?

VE:  Counsel, let me make sure I understand you correctly.  Are you saying their ability to sit is one hour in an eight hour day?  Or is it just one hour at a time?

Atty:  One hour at a time.  Without becoming stiff that they could not stand independently and move off.  And ambulate independently.  In other words, get up and go.

VE:  Well, of course, I mean, in the normal workplace, people take breaks.  I mean, they — and an normal break is every hour and a half or so.  If a person has difficulty standing up and moving after they've sat for an hour, certainly it's going to impact their comfort level, if nothing else.  But I don't think it would preclude the essential functions of working as an order clerk or an information clerk.  I mean actually doing the essential functions of those jobs.  I'm having a little difficulty visualizing what you're saying.

Atty:  You said if it affects their comfort level.  If somebody's comfort level is affected, would that cause them— do you think that would create problems with them with their concentration on the job?

ALJ:  Well, that's beyond his sphere of expertise.  Ask him about vocational factors.

Atty:  Well, I think concentration is a vocational factor.

ALJ:  But you're asking him to make some kind of medical assessment.

Atty:  Well, if the pain creates a problem with concentration, is that going to impact a person's ability to do his work?  And that's what I'm asking him. I mean, I may not be asking it artfully.

ALJ:  Well, are you saying that if a person is unable to do even simple routine tasks because of his concentration difficulties?  Is that what you're asking?

Atty:  I don't think it goes to that level, Judge.  I'm just asking that if – can pain– well, the doctor's already answered the question.  Pain can impact a person's ability to concentrate.  Now, does that person's having an impact on their ability to concentrate– and I don't know what level that rises to– but does it create a problem for a person in doing these jobs, if their concentration is impacted?

ALJ:  You mean impacted–you said not to the extent that they are unable to do simple routine tasks.

ATTY:  All of the time.  But they have the—

ALJ:  You see what I'm saying?  You need to put it in levels of functioning at the workplace.  That's Mr. Pettingill's area of expertise.

Atty:  Okay.  I guess I don't know how to ask that question artfully, Judge.

ALJ:  Well, I thought I gave you a strong hint earlier when I said a person's inability to concentrate is so impacted that this person can't do simple routine tasks on a day in, day out basis.

Atty:  On a weekly and competitive basis.

ALJ:  Yes.  Day in, day out basis.

Atty:  Okay.

ALJ:  I mean, I would assume if a person can't even do that, that person is completely unemployable.  Is that correct, Mr. Pettingill?

VE:  That would be my opinion, your Honor.  Yes, sir.

Atty:  And if a person were limited, as the claimant has testified, to lifting and/or carrying no more than 8 lbs., would that erode the base of jobs that you've listed.

VE:  Well, theoretically, counsel, that falls before the exertional level required to do even sedentary work.  But again, there are jobs in the national economy that do not require any lifting at all.  So it wouldn't preclude the entire base.  I shouldn't say any lifting, but no more than, you know, lifting a notebook or a ledger.  So it wouldn't completely erode that–eliminate the base.  No, sir.  But it would– it wouldn't complete eliminate the base. No, sir.  But it would–it wouldn't completely eliminate the base, but it would have a significant erosion, I guess I should say.

Atty:  Okay.  "Significant" meaning—

VE:  Maybe 5 percent of the base.  5 to 10 percent of the base in the national economy.

Atty:  Okay.  Is that eroding 5 to 10 percent?

VE:  No, no.  It would leave that much.

Atty:  Okay.  If a person, as in hypothetical one, were required to use a cane to ambulate, in their dominant hand, would that erode the base of jobs that are available?

VE:  Not at the sedentary level.  No, sir, it would not.   (TR.383-388).

Plaintiff argues that the jobs identified by the vocational expert that Still could perform such as a telephone order clerk, officer helper, and information clerk exceed Still's mental RFC and therefore, are inconsistent with Dr. Lonnecker's assessment and with the ALJ's mental RFC, which was not given as a hypothetical to the VE.  Rather, the VE was asked about "simple routine tasks, performed at a non-assembly line pace."  Because there was no elaboration by either the ALJ or VE concerning the meaning of "simple routine tasks, performed at a non-assembly line pace" and because no additional explanation or elaboration was given by the ALJ concerning whether this limitation was consistent with his mental RFC findings and Dr. Lonnecker's report, the matter must be remanded for further development of the record, including a new RFC assessment that incorporates Still's mental and physical limitations, and at step five, the ALJ should reconsider Still's ability to perform any work.

## V. Conclusion

Based on the foregoing, and the conclusion that the ALJ's RFC assessment does not include Still's mental RFC, further development of the record is necessary, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge

ORDERS that Defendant's Motion for Summary Judgment (No. 14), is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 16) is GRANTED, and this case is REMANDED to the Social Security Administration pursuant sentence 4 of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 29th day of February, 2008.

Frances H. Stacy
United States Magistrate Judge